# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE JAMES WARREN MAY,** | ) | |
| | ) | |
| **Debtor.** | ) | |
| | ) | |
| **JAMES WARREN MAY,** | ) | |
| | ) | |
| **Plaintiff/Appellant,** | ) | **CIVIL ACTION 10-0431-WS-N** |
| | ) | |
| **v.** | ) | **(Bankr. Adv. Case No. 09-01004)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant/Appellee.** | ) | |

## ORDER

This matter comes before the Court on plaintiff/appellant James Warren May's Notice of Appeal (doc. 1) pursuant to 28 U.S.C. § 158(a) from the Bankruptcy Court's Orders entered on March 17, 2010 and May 25, 2010, as well as the Judgment entered on April 9, 2010.[1]  The briefing process having concluded, this appeal is now ripe for disposition.

**I.      Bankruptcy Court Proceedings and Rulings from which Appeal is Taken.**

   ***A.       The Adversary Complaint and Counterclaim.***

On or about December 12, 2008, plaintiff/appellant, James Warren May, initiated Chapter 7 liquidation proceedings in the U.S. Bankruptcy Court for the Southern District of Alabama.  May's bankruptcy schedules reflect that the principal debts from which he sought relief were unpaid state and federal personal income taxes, interest and penalties relating to the 1998 and 1999 tax years.  A month later, on January 12, 2009, May filed an adversary complaint against the United States of America (the "Government") in the Bankruptcy Court.  In his adversary complaint, May requested a discharge of his federal income tax liabilities for the 1998

---

[1]      May is representing himself in connection with this appeal.  Although the case authorities are rife with cautionary statements about the leeway to which *pro se* filings are generally entitled, such considerations are attenuated here given May's more than four decades of experience as a practicing attorney.

and 1999 tax years pursuant to Section 523 of the Bankruptcy Code.  (Doc. 1.)[2]  The

Government responded by filing an Answer and Counterclaim wherein it asserted, among other

things, that these tax liabilities are non-dischargeable pursuant to 11 U.S.C. § 523(a)(1)(C).[3]

(Doc. 9.)  The Counterclaim requested that the Bankruptcy Court decree May's 1998 and 1999

tax liabilities to be excepted from discharge on the ground that he had willfully attempted to

evade or defeat such taxes, and further requested entry of judgment in the Government's favor

for unpaid tax liabilities of $185,194.52, plus statutory additions dating from January 12, 2009.

(*Id.*)  May filed a Reply to Counterclaim alleging that he had made "substantial payments" to the

Government for the outstanding tax liabilities and that "[b]ut for the malicious and vindictive

actions of the revenue officers assigned to the case, the taxes would now be paid in full."  (Doc.

27, ¶ 4.)  The Reply also set forth May's express denial that he had willfully or intentionally

failed to pay taxes, and indicated that May "has used all of his savings and nearly all of this

income to pay delinquent taxes for the periods in question," although he was referring principally

to payroll taxes, not the income taxes at issue here.  (*Id.* at 2.)

The Government unsuccessfully moved for summary judgment on two occasions in the

adversary proceeding.  The matter went to trial before U.S. Bankruptcy Judge Shulman on

January 11, 2010, and both sides were afforded a full and fair opportunity to present trial briefs,

oral testimony, exhibits and closing arguments in support of their respective positions.  The

parties collectively offered nearly 200 exhibits into evidence as well as more than 40 pages of

trial briefs for the Bankruptcy Court's review.

---

[2]       Unless otherwise noted, all citations to numbered documents in this Order refer to
document numbers assigned by the Bankruptcy Court to filings in the adversary proceeding,
rather than District Court document numbers.  Those numbers correspond to particular
documents found in the "Designation of Record on Appeal."  The more than 575 pages of
documents contained in the appellate record are found at documents 1 through 3 in the District
Court file, and the 186-page trial transcript is found at document 4 in the District Court file.

[3]       That statute creates an exception to discharge for an individual's debt "for a tax or
a customs duty … with respect to which the debtor made a fraudulent return or willfully
attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).

**B.       The Bankruptcy Court's Nondischargeability Ruling.**

On March 17, 2010, Judge Shulman issued a 16-page written Order Determining Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(1)(C), ruling that May's 1998 and 1999 federal income tax liabilities were nondischargeable.  (*See* doc. 65.)

In a lengthy "Findings of Fact" section, the Bankruptcy Court recited the following findings, *inter alia*: (i) May is a 69-year old attorney who has practiced law in Baldwin County, Alabama since 1984; (ii) for the 1998 tax year, May reported adjusted gross income of $418,457, and federal tax liability of $143,777, compared to just $77,527 in withholdings; (iii) for the 1999 tax year, May did not file a federal income tax return until April 2003, showing tax liability of $28,973 against just $9,277 in withholdings; (iv) May's tax problems date back to the 1980s; (v) May transferred ownership of a jointly owned marital residence in Magnolia Springs to his then-wife in 1989 to prevent loss of the house to creditors; (vi) when May divorced and remarried in 1991, he had the Magnolia Springs property deeded directly from his ex-wife to his current wife, Lisa May ("Mrs. May"), as a purported "wedding gift"; (vii) in federal litigation in 2006, this District Court held that Mrs. May was May's nominee with respect to the Magnolia Springs property, such that May had a beneficial interest in that property;[4] (viii) in 1998, May earned a substantial fee in excess of $400,000; (ix) that same year, May decided to renovate the Magnolia Springs home in his wife's name and spent approximately $180,000 for that purpose;  (x) unexpected cost overruns in those renovations left May with insufficient funds to pay his 1998 and 1999 tax year liabilities; (xi) in court filings and tax documents over the years, May has made inconsistent and inaccurate representations concerning ownership and/or valuation of assets, such as the Magnolia Springs property, vehicles, and his professional corporation; (xii) May did not maintain a personal checking account because the IRS has previously pursued collection activities against such accounts, but instead placed his earnings in a separate business account from which Mrs. May withdrew funds for personal expenses; (xiii) in May 2005, May agreed to pay the IRS $500 per month on his past due income taxes, but only made approximately 15 such payments before stopping; (xiv) the Mays attempted to refinance the Magnolia Springs property to raise money to pay the IRS liabilities, but the lender backed out

---

[4]       *See Lisa May v. A Parcel of Land, et al.*, 458 F. Supp.2d 1324 (S.D. Ala. 2006), *aff'd*, 2007 WL 3287513 (11th Cir. Nov. 8, 2007), *cert. denied*, 128 S.Ct. 2943 (2008).

just prior to closing when the IRS announced its intention to file a nominee lien against the property; (xv) the Baldwin County Tax Assessor's Office appraises the Magnolia Springs home (which is located in a particularly desirable area of Baldwin County) at $650,000; and (xvi) in recent years, May has spent money on luxury vacations, including a trip for Mrs. May and the couple's children to Europe in 2007, plus stays at the Royal Sonesta Hotel in New Orleans, the Little Palm Island Resort in Florida, and continuing legal education trips in various locations around the country.

In a separate "Conclusions of Law" section, the March 17 Order found that the totality of May's conduct (including the titling of the Magnolia Springs home in his wife's name, transfer of $180,000 to his wife to refurbish that home, use of nominee checking accounts, omissions or understatement of property on bankruptcy schedules, and an extravagant lifestyle) demonstrated that he had attempted to evade or defeat the tax debt.  (Doc. 65, at 10-12.)  In so doing, Judge Shulman observed that May's actions "have a striking similarity to those of the debtor in *In re Jacobs*, 490 F.3d 913 (11th Cir. 2007)."  (*Id.* at 11.)  The March 17 Order further concluded that in addition to meeting § 523(a)(1)(C)'s "conduct" requirement, the evidence showed that the statute's "mental state" requirement was satisfied.  In that regard, the Bankruptcy Court found that several "badges of fraud" indicated that May had voluntarily and intentionally violated a known duty to pay income taxes, inasmuch as he had titled the Magnolia Springs property to his wife when he was experiencing tax problems, he had drawn down his own assets by funneling $180,000 into renovations for a house titled to someone else rather than paying off his own personal tax liabilities, he had engaged in a "consistent pattern of action … to conceal" by titling his property (home, vehicles, bank accounts) exclusively in others' names, and he had misstated the existence and valuation of assets on 2008 bankruptcy schedules in a manner indicative of "a knowing and deliberate plan to conceal [his] property and values, and a cavalier disregard for accurately filling out his bankruptcy schedules which were signed under oath."  (Doc. 65, at 13-15.)  As to willfulness, the Bankruptcy Court rejected May's protestations at trial that he was an innocent victim of contractor cost overruns, pointedly stating that "[i]t is clear from the Debtor's efforts to prevent holding any real or personal property in his own name and his unexplained failure to properly schedule assets in his bankruptcy schedules that he acted knowingly and consciously."  (*Id.* at 15.)  And the Bankruptcy Court was unmoved by May's argument that he strived to pay down his 1998 and 1999 tax bills after the IRS began pursuing him, reasoning that

subsequent "efforts to pay his taxes do not mean that he did not willfully avoid paying them in the first place." (*Id.* at 16.)

In light of these determinations, the March 17 Order concluded with a specific finding that May had acted willfully to evade or defeat payment of his 1998 and 1999 federal income taxes, and that those liabilities were therefore nondischargeable under § 523(a)(1)(C). On April 9, 2010, the Bankruptcy Court entered final judgment in favor of the Government, and against May, in the adversary proceeding. (Doc. 72.)

### C. *May's Post-Trial Motions.*

In the wake of the Bankruptcy Court's ruling that his tax liabilities were not dischargeable, May filed a Motion for New Trial (doc. 77) identifying a whopping 19 assignments of error, as well as a contemporaneous Motion to Alter or Amend (doc. 78) requesting nine sets of revisions to the findings of fact contained in the March 17 Order.

On May 25, 2010, the Bankruptcy Court entered a written Order Denying Motion for New Trial and Motion to Alter or Amend (doc. 81). With respect to the Motion to Alter or Amend, the May 25 Order explained that it was not well taken because three of May's requested modifications dealt with facts that would not affect the underlying ruling and the remaining requests amounted to quibbling "with the way the Court presented the facts rather than their accuracy." (Doc. 81, at 4.) The Bankruptcy Court determined that May had failed to show clear error as to any material fact that might warrant altering or amending the previous order and judgment.

As for the Motion for New Trial, the May 25 Order again found no clear errors of fact, and declined to credit May's conclusory assertions that the underlying ruling had improperly applied or misinterpreted the law. The May 25 Order stated, "The Court carefully considered the law related to § 523(a)(1)(C) in the Eleventh Circuit and applied it to the facts of the case." (*Id.* at 4-5.) The Bankruptcy Court also concluded that the underlying ruling's failure to address penalties and interest did not necessitate or justify a new trial because it is customary for only a general finding of dischargeability or nondischargeability to be made, with the parties being free to bring a separate proceeding if they cannot agree on any nondischargeable amounts owed.

For these reasons, both of the debtor's post-judgment motions below were denied. May has appealed the May 25 Order, as well as the March 17 Order and accompanying Judgment, to this District Court pursuant to 28 U.S.C. § 158(a).

## II.  Issues Joined on Appeal.

In his appeal to this District Court, May identifies 11 enumerated assignments of error.[5] Because of the overlapping and in some cases vague and duplicative nature of these asserted grounds for appeal, May helpfully grouped them into three distinct categories in his legal memoranda attendant to the appeal.  Organized in this fashion, May's first category of issues raised on appeal is that "the placement of title to the marital home place in the name of Mrs. May eight years before the taxes in issue became due is too remote to support the conduct prong." (Appellant's Brief, at 4.)  His second category alleges that the Bankruptcy Court "erred in failing to consider all of the conduct demonstrated by evidence in the record."  (*Id.*)  And his third set of objections centers on a purported lack of evidence "that the debtor had the present ability to pay the taxes when they became due."  (*Id.* at 5.)  These issues will be addressed sequentially.

## III.  Governing Legal Principles.

### A.  *Standard of Review.*

It is well established that "the district court in reviewing the decision of a bankruptcy court functions as an appellate court."  *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994).  In that regard, "[t]he district court makes no independent factual findings," but instead reviews "the bankruptcy court's factual determinations under the 'clearly erroneous' standard."  *Id.*; *see also In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993) ("If the bankruptcy court is silent or ambiguous as to an outcome determinative factual question, the case must be remanded to the bankruptcy court for the necessary factual findings.").  "Factual findings are not clearly erroneous unless we are left with the definite and firm conviction that the court erred."  *In*

---

[5]  Those issues include the following: (i) unspecified findings of fact were clearly erroneous; (ii) the Bankruptcy Court failed to consider May's "total conduct"; (iii) the Bankruptcy Court wrongly relied on the deeding of the Magnolia Springs residence for the § 523(a)(1)(C) "conduct" element; (iv) the Bankruptcy Court failed to weigh unspecified evidence contrary to its intent finding (seemingly redundant of issue (ii)); (v) the findings of fact were incomplete in unspecified respects; (vi) the Government's willfulness evidence was insufficient; (vii) the Bankruptcy Court misinterpreted and misapplied the term "willfully" in § 523(a)(1)(C); (viii) unspecified conclusions of law were incorrect; (ix) the Bankruptcy Court misinterpreted the term "willfully" in § 523(a)(1)(C) (seemingly redundant of issue (vii)); (x) the Bankruptcy Court found no evidence of May's present ability to pay taxes when they became due; and (xi) the Bankruptcy Court failed to take into account the totality of May's conduct (seemingly redundant of issues (ii) and (iv)).  (*See* doc. 92.)

*re Walker*, 515 F.3d 1204, 1212 (11th Cir. 2008) (citation and internal quotation marks omitted); *see also In re Thomas*, 883 F.2d 991, 994 (11th Cir. 1989) ("clearly erroneous" standard applies to bankruptcy court's findings of fact, whether based on oral or documentary evidence, and "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"). By contrast, the Bankruptcy Court's conclusions of law are subject to *de novo* review. *See, e.g., In re Tennyson*, 611 F.3d 873 (11th Cir. 2010) ("Conclusions of law reached by a bankruptcy court … are reviewed *de novo*.") (citation and internal quotation marks omitted). In sum, then, the Bankruptcy Court's "[l]egal conclusions … are reviewed *de novo* and findings of fact are reviewed for clear error." *In re Celotex Corp.*, 613 F.3d 1318, 1322 (11th Cir. 2010); *see also In re Cox*, 493 F.3d 1336, 1340 n.9 (11th Cir. 2007) ("Like the district court, we review the bankruptcy court's findings of fact for clear error and the court's conclusions of law and mixed questions of law and fact *de novo*.").

> **B.       Salient Features of Section 523(a)(1)(C).**

A Chapter 7 petitioner such as May "generally receives a discharge from all debts that arose before he or she filed the bankruptcy petition." *In re Jacobs*, 490 F.3d 913, 921 (11th Cir. 2007).[6] However, Congress enacted various exceptions to that rule to ensure that "this 'fresh start' policy is only available to the honest but unfortunate debtor." *In re Fretz*, 244 F.3d 1323, 1326 (11th Cir. 2001) (citations and internal quotation marks omitted). One such exception provides that a Chapter 7 bankruptcy does not discharge an individual's tax debts "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). "The Government bears the burden to prove, by a preponderance of the evidence, that a particular claim is nondischargeable under § 523(a)." *Jacobs*, 490 F.3d at 921 (quoting *In re Griffith*, 206 F.3d 1389, 1396 (11th Cir. 2000)). In that regard, "[e]xceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor," provided, however, that courts must not disregard the plain terms of the statute but must instead "interpret straightforward, unambiguous language in the Bankruptcy Code … according to its plain meaning." *Fretz*, 244 F.3d at 1327.

---

[6]       The relevant statute provides that, "[e]xcept as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter …." 11 U.S.C. § 727(b). The exception at issue here indeed arises under the § 523 carve-out set forth in § 727.

In applying the § 523(a)(1)(C) exception, courts examine two distinct components, both of which the Government must satisfy. In particular, the law of this Circuit is clear that § 523(a)(1)(C) "contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and a mental state requirement (that the attempt was done 'willfully')." *Jacobs*, 490 F.3d at 921 (quoting *Fretz*, 244 F.3d at 1327). It bears emphasis that "mere nonpayment of taxes, without more, does not constitute a willful attempt to evade or defeat taxes under § 523(a)(1)(C)." *Jacobs*, 490 F.3d at 922 (quoting *Griffith*, 206 F.3d at 1395); *In re Sternberg*, 229 B.R. 238, 246 (S.D. Fla. 1998) ("Because simple nonpayment of a tax does not justify a finding of nondischargeability, the taxing authority must prove willful evasion."). Rather, to satisfy the "conduct" requirement, the Government must prove that "the debtor engaged in affirmative acts to avoid payment or collection of the taxes, … either through commission or culpable omission." *Jacobs*, 490 F.3d at 921 (citation and internal quotation marks omitted). And the "mental state" requirement contemplates proof that "the debtor's attempt to avoid tax liability was done voluntarily, consciously or knowingly, and intentionally." *Id.* (citation and internal quotation marks omitted). The debtor has the requisite scienter under § 523(a)(1)(C) where "(1) the debtor had a duty under the law, (2) the debtor knew he had that duty, and (3) the debtor voluntarily and intentionally violated that duty." *Id.* (quoting *Griffith*, 206 F.3d at 1396). Importantly, the mental state element may be satisfied on a lesser showing than outright fraud. *See Fretz*, 244 F.3d at 1330 ("[f]raudulent intent is not required" for § 523(a)(1)(C) purposes, so long as debtor acted voluntarily, consciously or knowingly, and intentionally").[7]

In this case, the Bankruptcy Court determined that May had willfully attempted to evade or defeat a tax. The Eleventh Circuit has made clear that this determination is one of fact subject to the "clearly erroneous" standard of review on appeal. *See Jacobs*, 490 F.3d at 921 ("Whether

---

[7]     For all of this guidance and direction, the Eleventh Circuit has resisted cataloging the universe of circumstances in which tax debts are nondischargeable pursuant to § 523(a)(1)(C). *See Fretz*, 244 F.3d at 1327 ("Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation.") (citations omitted). Therefore, the relevant analysis does not call for comparison of the debtor's conduct to a finite set of benchmark circumstances constituting willful evasion, but is instead a more open-ended and flexible inquiry weighing the totality of the circumstances.

or not a debtor willfully attempted to evade or defeat a tax is a question of fact reviewable for clear error."); *Sternberg*, 229 B.R. at 246 ("The issue of willful evasion is a question of fact that is to be determined by the bankruptcy court from the totality of the record."). This Court proceeds in recognition of that principle.

## IV.  Analysis.

The Court will consider each of the three categories of issues raised on appeal by May, in the same sequence that May utilized in identifying the issues in his principal brief. Unfortunately, appellant did not treat each category of claims separately in the "Argument" portion of that brief, but instead submitted 10 pages of legal argument lumping all of his issues into an undifferentiated whole, without linking specific points to specific categories of issues on appeal.[8] Appellee followed suit in its submission. This kind of haphazard briefing untethered to May's particular assignments of error unnecessarily complicates review, as both sides fail to focus their briefing on the specific grounds for appeal delineated in document 92.

### A.     *The Conduct Prong and the Magnolia Springs Property.*

As noted, May contends as his first category of issues on appeal that "the placement of title to the marital home place in the name of Mrs. May eight years before the taxes in issue became due is too remote to support the conduct prong of the analysis." (Appellant's Brief, at 4.) May's argument is that the Bankruptcy Court erred by predicating its decision to declare the tax liabilities nondischargeable on May's act of deeding the Magnolia River property to his wife in 1991. According to appellant, this singular event was the prime motivating force behind the Bankruptcy Court's § 532(a)(1)(C) analysis.[9] Such heavy reliance on the deed to the marital

---

[8]       Indeed, a number of the arguments raised by May do not appear related to specific items set forth in his Statement of the Issues Presented for Review (doc. 92). The Court nevertheless will consider them, albeit while working from the organizational structure of appellant's designated issues on appeal.

[9]       May stakes out this position as the centerpiece of his appeal. For example, he argues that "[t]he bankruptcy court could not or would not look beyond the deed which had been executed more than 18 years earlier and *based its decision to deny discharge largely on that fact.*" (Appellant's Brief, at 13 (emphasis added).) Elsewhere, May states, "That subject, the deed to the house, *dominates the controversy* and is the principal reason for the conclusion that the taxes are not dischargeable." (*Id.* at 14 (emphasis added).) According to May, "[I]t is clear that the Bankruptcy Court concluded that the taxes were not dischargeable *based largely on the* (Continued)

home was error, May contends, because "[t]o argue that the deed was executed with an intent to evade or defeat a tax which would not become due until eight or nine years later is preposterous." (*Id.* at 14-15.)

This line of reasoning is faulty in two distinct respects. First, May's argument flows from the faulty premise that May's arranging his affairs to place title for the marital home solely in Mrs. May's name back in 1991 "dominates the controversy" and that the Bankruptcy Court found "that the deed satisfied the conduct requirement." In other words, May says the Bankruptcy Court ruled against him based entirely on his transfer of the house to his wife in 1991. This is a gross distortion of the rulings below. May's position is supported neither by the Bankruptcy Court's written orders nor its statements from the bench during the trial. Appellant does not advance his cause by mischaracterizing the basis and reasoning of the Bankruptcy Court's decision in this manner.

The March 17 Order recited six and a half pages of facts pertinent to the § 523(a)(1)(C) inquiry, of which approximately a single page concerned the 1991 transfer of the deed to the marital home to Mrs. May. Moreover, that Order's analysis of the "conduct" prong expressly considered and addressed a broad range of factors, including the titling of the home, May's expenditure of $180,000 in home renovations during the 1998-99 period, May's use of nominee checking accounts, his titling of his vehicles in others' names, his misleading and incorrect bankruptcy schedules, and his excessive discretionary spending. In short, the Bankruptcy Court's "conduct" analysis under § 523(a)(1)(C) properly weighed and considered a collage of evidence of affirmative acts and omissions by May to avoid payment of taxes. There is no basis for May's repeated insistence that the Bankruptcy Court hinged its "conduct" finding solely or even primarily on the Magnolia Springs property transfer in 1991. That event was merely one of numerous factors cited by the March 17 Order.[10] In short, because the Bankruptcy Court

_____

*deed* drafted and executed nineteen years before the trial. ***The court's conclusion obviously was that the deed satisfied the conduct requirement.***" (*Id.* (emphasis added).)

[10]    To the extent that May maintains that the trial transcript (rather than the written order) demonstrates the predomination of May's decision to deed the property to his wife in 1991, that argument is likewise counterfactual. Judge Shulman's remarks from the bench demonstrate that he was far more concerned with May's siphoning of many thousands of dollars of his earnings into renovating the Magnolia Springs house in 1999 than with his placing the (Continued)

considered the deeding of the property as one of a host of facts supporting its findings under the "conduct" prong of § 523(a)(1)(C), the Court rejects the premise of May's appeal that the Bankruptcy Court hinged its analysis exclusively or even principally on that 1991 property transfer.

Second, even if May actually intended to argue that it was error for the Bankruptcy Court to afford <u>any</u> weight (rather than dispositive weight) to the titling of the property that substantially predated the tax liabilities in question, this ground for appeal would remain meritless. A debtor's conduct preceding accrual of the subject tax liability is clearly relevant to showing an evasive purpose and may properly be considered under § 523(a)(1)(C). *See, e.g., Matter of Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996) ("Although an attempt to defeat tax in 1974 will not except discharge of an unpaid tax liability for 1980, the earlier conduct is relevant evidence concerning whether the debtor's actions in 1980 were the result of honest mistake or deliberate evasion."); *In re Mixon*, 2008 WL 2065895, *7 (Bankr. N.D. Tex. May 13, 2008) ("culpability may be established by circumstantial evidence … including the debtor's conduct over a period of time which may extend beyond the time when the tax payment was due"); *In re Mills*, 337 B.R. 691, 702 (Bankr. D. Kan. 2005) (among factors considered is "what was the debtor's history with the IRS prior to the time he started not paying taxes?"); *In re Hassan*, 301 B.R. 614, 624 (S.D. Fla. 2003) (considering debtor's Chapter 7 filing that predated tax liabilities

---

property in his wife's name in 1991. As he stated, "Well, let's put aside the putting in the name of. … ***The more important argument to me that the government has that's detrimental to [May] is that assuming it's in her name, all of his income went to put toward a house that's not in his name.*** … Then he's using this money and transferring the money that he got that otherwise would have been used to pay taxes and transferring for benefit of his wife who owns the house …. [H]e's taking his income and transferring it for another use." (Trial Transcript (doc. 93), at 172-73 (emphasis added).) Judge Shulman elaborated on this concern as follows: "The timing is, and I think this is important. The timing is he gets a big hit and makes $400,000, more than any money he's ever made in his … professional career. … Well, he knows he's incurring income tax for that year because of all this money. And he still transfers the money anyway for the benefit of his wife by putting it into the house. It would be the same thing as just handing it over to her and saying here, take it." (*Id.* at 174.) Thus, far from supporting May's position that the deed to the house dominates this controversy, the trial transcript unequivocally shows that, for purposes of applying § 523(a)(1)(C), the Bankruptcy Court was far more concerned with asset transfers by May to and for the benefit of his wife in 1998 and 1999 than he was the initial deeding of the property.

at issue, because prior case was relevant to § 523(a)(1)(C) test in showing debtor's awareness of tax obligations, as well as pattern of nonpayment of taxes).[11]  In the context of this action, May's pattern of conduct both before and after 1998 displays ongoing efforts to secret his assets and income from taxing authorities, which is clearly germane to the critical questions of whether he willfully engaged in affirmative acts and omissions to evade the tax liabilities at issue here.[12] Accordingly, any suggestion that the Bankruptcy Court was duty-bound to turn a blind eye to May's acts and omissions preceding the 1998 and 1999 tax liabilities is unfounded, as a matter of law.[13]

Finally, appellant's attempt to classify his transfer of the Magnolia Springs residence to Mrs. May in 1991 as a discrete event is not an accurate portrayal of the facts as they played into

---

[11]     May admits as much, stating that "an attempt to defeat a tax in a given year will not except discharge of a later unpaid tax liability although the conduct is relevant to the 'total conduct' examination." (Appellant's Brief, at 15.)  That concession is difficult to reconcile with May's position that the Government's proof of "any effort to evade or defeat a tax should be directed to a specific tax and not taxes in general." (*Id.*)  May provides no authority for the latter proposition, and there is considerable authority (some of which is cited *supra*) deeming past tax evasion relevant to the § 523(a)(1)(C) inquiry.  Besides, there is abundant evidence (discussed herein and in the Bankruptcy Court's written orders) tending to show that May's conduct was an attempt to evade his 1998 and 1999 federal income tax liability, rather than "taxes in general." Thus, even accepting May's somewhat contradictory formulation of the relevant legal principles, his appeal would fail.  Even under May's proffered legal standard, there was ample evidence from which the Bankruptcy Court could have determined (and in fact did determine) that the legal standard for willful evasion of tax liability was satisfied, rendering May's 1998 and 1999 tax debts nondischargeable.

[12]     Consideration of debtors' patterns of conduct in a § 523(a)(1)(C) analysis is well-documented and uncontroversial.  *See generally Birkenstock*, 87 F.3d at 951-52 ("where nonpayment is coupled with … other measures to conceal assets or income from the IRS, … a court may reasonably find that the debtor sought to 'evade or defeat' his tax liabilities"); *Matter of Bruner*, 55 F.3d 195, 200 (5th Cir. 1995) (finding that "pattern of non-payment … coupled with conduct obviously aimed at concealing income and assets, certainly constitutes a willful attempt to evade or defeat taxes").

[13]     Besides, given the abundant other evidence of willful evasion and affirmative conduct found by the Bankruptcy Court in the years 1998 and beyond, any error attendant to its consideration of the 1991 deed transfer would be harmless.  In other words, even if May's act of titling the Magnolia Springs property in his wife's name in 1991 should have been excised from the § 523(a)(1)(C) analysis, the result of that analysis would remain unchanged based on record evidence of May's conduct <u>after</u> those tax liabilities arose.

the Bankruptcy Court's analysis. While the transfer itself may have happened in 1991, it yielded ongoing financial consequences reverberating through and beyond the accrual of the tax liabilities at issue in this case. More precisely, that transfer facilitated subsequent large transfers of May's earnings to Mrs. May during and after the accrual of the tax liabilities at issue. After all, May continued to pay all or substantially all of the day-to-day expenses incident to home ownership, including all property taxes and mortgage payments on the property, and contributed as much as $180,000 to renovations of that property in 1999. *See May v. A Parcel of Land*, 458 F. Supp.2d 1324, 1330 (S.D. Ala. 2006).[14] In other words, the Magnolia Springs property served as a conduit through which May continued to funnel significant earnings to Mrs. May, assets that otherwise could have been used or seized to pay off or at least pay down May's income tax liabilities for 1998 and 1999. Contrary to May's position on appeal, this fact (and not the deed of the property itself) was central to the Bankruptcy Court's determinations on dischargeability.

### B. *The Totality of the Conduct,* Jacobs *and* Hayes.

May's second category of objections to the Bankruptcy Court's ruling that the tax liabilities are not dischargeable posits that "the court below erred in failing to consider all of the conduct demonstrated by evidence in the record." (Appellant's Brief, at 4.) Although appellant's brief devotes little attention to this argument, it appears that his theory on appeal is twofold: (i) the Bankruptcy Court purportedly did not consider certain facts in weighing the totality of circumstances under § 523(a)(1)(C); and (ii) the Bankruptcy Court incorrectly likened May's circumstances to one Eleventh Circuit guidepost decision (*In re Jacobs*, 490 F.3d 913 (11th Cir. 2007)) rather than another (*In re Haas*, 48 F.3d 1153 (11th Cir. 1994)).

### 1. *Whether the Bankruptcy Court Considered the Totality of Conduct.*

As an initial matter, it is a correct statement of law that the totality of the circumstances must be examined in assessing whether tax liabilities are dischargeable under § 523(a)(1)(C). *See, e.g., In re Swenson*, 381 B.R. 272, 297 (Bankr. E.D. Cal. 2008) ("[C]ourts must consider the

---

[14] The parties have stipulated that the findings of fact in the *May* opinion are accurate and binding on them. (Doc. 47, ¶¶ 22-23.) And the *May* opinion contained a finding that "it is undisputed that [Mrs. May] paid for the renovations using (a) borrowed money from mortgage refinancings, on which mortgage payments were made 100% by James May; and (b) 'about $100,000' in monetary gifts from James May. … James May was the source of and responsible for every penny used to renovate the Property." *May*, 458 F. Supp.2d at 1330 (record citations and footnote omitted).

'totality of the circumstances' in determining whether § 523(a)(1)(C) should prevent the discharge of debtor's tax debts.") (citation omitted); *In re Volpe*, 377 B.R. 579, 586 (Bankr. N.D. Ohio 2007) ("When determining whether the conduct element or mental state requirement has been satisfied, the totality of the debtor's conduct is considered.").[15]  In his briefs, May asserts that the Bankruptcy Court failed to adhere to that standard, but instead considered "only matters proffered by the government" in an "unfair" manner in making its findings of fact.  (Appellant's Reply, at 1.)  This characterization of the Bankruptcy Court's rulings is inaccurate.  Upon careful examination of the record and the underlying rulings, this Court finds that for each fact that May claims was disregarded, either the Bankruptcy Court actually did consider it or May failed properly to present it at trial.

For starters, May stresses that during the relevant time period he faithfully abided by his agreements with the IRS to repay delinquent tax balances, including both the income taxes at issue here and delinquent law firm payroll taxes (which he eventually paid off).  (Appellant's Brief, at 9, 11-13, 19, 20; Reply Brief, at 7-8.)  Far from ignoring those facts, however, the Bankruptcy Court expressly recognized them.  For example, the March 17 Order indicated that May "has paid his payroll taxes and other personal taxes" and that May "was making efforts to pay the delinquent taxes."  (Doc. 65, at 16.)  The Bankruptcy Court found, however, that these facts were mitigated by other circumstances, such as May's reduction in his offer to repay the IRS out of refinancing proceeds.  The Bankruptcy Court also reasoned that May's efforts to make good on his tax liabilities after being caught are not particularly probative as to intent, inasmuch as "the Debtor's efforts to pay his taxes [after the fact] do not mean that he did not willfully avoid paying them in the first place."  (*Id.*)[16]  Thus, although May protests on appeal

---

[15]     The Bankruptcy Court expressly acknowledged and applied that standard, writing in the March 17 Order that "[c]ourts look to the totality of the debtor's circumstances and the individual facts in a debtor's case to make this determination."  (Doc. 65, at 10.)

[16]     There is ample support in the case law for this proposition.  *See, e.g., Mixon*, 2008 WL 2065895, at *7 ("[T]he debtor may not establish the absence of the required intent by presenting evidence of offers in compromise filed with the IRS long after the debtor learned of the tax liability."); *In re Hatton*, 220 F.3d 1057, 1061 (9th Cir. 2000) (taxpayer's belated acceptance of responsibility does not negate willfulness finding where debtor "only cooperated with the IRS once collection became inevitable"); *In re Klayman*, 333 B.R. 695, 704 (Bankr. E.D. Pa. 2005) (probative value of debtor's offers of compromise to Government depends on timing and circumstances under which they were made).  More generally, "paying some of the (Continued)

that the "totality of the circumstances" test was violated because the Bankruptcy Court ignored his repayment effort, this fact was actually considered in the ruling from which appeal is taken. Therefore, May's appeal boils down to mere quibbling with the weight assigned to that circumstance by the court below. This line of attack is futile given the limited probative value of *post hoc* repayment efforts under § 523(a)(1)(C). In short, the Court perceives no error, much less clear error, in the Bankruptcy Court's treatment of May's after-the-fact repayment efforts.[17]

May also suggests that the Bankruptcy Court failed to take into account his contention that the IRS is to blame for his inability to pay off his income tax liabilities. According to May, the IRS's decision to file a tax lien on the Magnolia Springs property on the eve of a planned June 2004 refinancing effectively "torpedoed" that deal and prevented May from paying $50,000 in loan proceeds to the IRS toward those tax liabilities. (Appellant's Brief, at 9-11, 22; Reply Brief, at 8, 12-13.) Again, the Bankruptcy Court expressly considered and wrote to this circumstance. (*See* doc. 65, at 7.) May's contention that this fact was ignored in the "totality of circumstances" analysis is, again, incorrect. Moreover, far from being a capricious flexing of governmental muscle as May frames it, the Bankruptcy Court's findings of fact show that the Government had valid reasons for filing the nominee lien, inasmuch as May reduced his offer to the IRS from $50,000 to $35,000 in refinancing proceeds, the Mays sought to retain loan proceeds for their own benefit, and the lien was necessary to safeguard Government interests. (*Id.* at 7-8.)[18] In short, the Bankruptcy Court properly considered May's proposed refinancing

---

tax liability owed does nothing to show that a debtor's failure to make full payment was not voluntary or intentional." *Jacobs*, 490 F.3d at 927.

[17]     Besides, May's repeated insistence that he faithfully adhered to repayment agreements with the IRS flies in the face of apparently undisputed evidence that he promised to make $500 monthly payments beginning in June 2005, and stopped making such payments in June 2006. (Government Trial Exh. 5; Trial Transcript, at 30-31, 35.) It does not appear that May <u>ever</u> resumed these payments for tax liabilities that he undisputedly owes, as he has instead devoted his efforts to bringing multiple federal legal proceedings to block the IRS from collecting on those liabilities. So it is far from clear that he in fact abided by repayment agreements as to income taxes for any prolonged period of time.

[18]     Even if May argued that these findings of fact were clearly erroneous (which he has not), this Court would not agree given their solid record basis. Mort Swain, the lawyer who represented May at the time of the proposed refinance transaction, testified that the IRS would (Continued)

-15-

and the IRS's lien effectively negating that transaction, but viewed those events as a product of May's backfired efforts to drive a hard bargain with the IRS rather than an irrational governmental vendetta to grind down a helpless taxpayer. There is no error here.

Furthermore, May argues that the Bankruptcy Court erred in failing to consider alleged "intimidation, sexual harassment, and abuse of power and position" by the collection officer originally assigned by the IRS to May's case. (Reply Brief, at 12; Appellant's Brief, at 10.) According to May, these facts are "also part of the totality of conduct and should surely weigh against the government's position." (Reply Brief, at 12.) In support of this contention, May relies on a six-page affidavit executed by his wife, Lisa Clewis May, in May 2009 (the "Lisa May Affidavit"). (*See* doc. 24.) The Lisa May Affidavit chronicles allegations that the IRS agent initially assigned to this matter engaged in inappropriate personal and sexually-tinged interactions with Mrs. May, and suggested that her cooperation with his overtures could prevent adverse IRS treatment of her husband. But May never explains how it could be error for the Bankruptcy Court not to address the Lisa May Affidavit in its rulings when (i) that document was neither mentioned nor offered into evidence at trial, (ii) neither Mrs. May nor any other trial witness submitted admissible testimony about the substance of that affidavit, and (iii) the Government never had an opportunity to cross-examine Mrs. May about these very serious

---

not agree to any proposal through which "the Mays would have loan proceeds remaining in their hands that weren't being paid to the government. … [T]heir position was that Mr. May owned the house and they weren't going to release it" without full payment. (Trial Transcript, at 88.) Swain also testified that the Mays' refinance proceeds offer to the IRS started at $50,000, then dropped to $35,000 as negotiations wore on. (*Id.* at 92-93.) And Janet Oates, the IRS revenue officer who filed the nominee lien, testified at trial that the lien was imposed to protect the Government's interests, not to punish the Mays, and explained her thought process. (*Id.* at 130-31, 134-38.) While this evidence may not have been unchallenged or undisputed, the Bankruptcy Court acted well within its discretion in crediting the above witnesses' testimony over any testimony (such as that of May himself) to the contrary. *See generally Freeland v. Enodis Corp.*, 540 F.3d 721, 734 (7th Cir. 2008) ("it is for the bankruptcy court to assess the credibility of witnesses and weigh evidence, and we will not second guess the court's resolution of conflicting evidence"); *In re Western Asbestos Co.*, 416 B.R. 670, 691 (N.D. Cal. 2009) (if bankruptcy court's findings "are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently" and "the court pays special deference to a trial court's credibility findings") (citations omitted).

accusations of misconduct.[19]  All indications are that the Lisa May Affidavit was not considered by the Bankruptcy Court in entering the appealed-from rulings because appellant neither offered nor referenced it at trial.[20]  Therefore, May's reliance on the Lisa May Affidavit on appeal is unavailing and cannot serve as a basis for overturning the Bankruptcy Court's decision.  *See, e.g., In re General Development Corp.*, 84 F.3d 1364, 1369 (11th Cir. 1996) (exhibits not considered by bankruptcy court should not be considered in appellate record); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 339 (S.D.N.Y. 2008) (items not considered by bankruptcy court in entering order or judgment appealed from should not be considered on appeal).[21]

---

[19]    Although May does not refer to it, Swain testified that the IRS agent "had, according to Ms. May, made some inappropriate statements to her."  (Trial Transcript, at 79.)  Of course, coming from Swain, this testimony was hearsay because he had no first-hand knowledge of whether inappropriate statements had or had not been made.  Such evidence is far too tenuous a record basis for May to argue now that the Bankruptcy Court should have made findings of IRS agent misconduct, weighing against the Government in the § 523(a)(1)(C) calculus.

[20]    An appellant generally cannot offer previously available evidence on appeal that it neglected to submit to the bankruptcy court in the first instance.  *See In re El Comandante Management Co., LLC*, 395 B.R. 807, 815 (D.P.R. 2008) ("new evidence, which could have been offered in the trial court, is not supposed to be proffered for the first time in an appellate setting") (citation omitted);  *In re Loefgren*, 305 B.R. 288, 291 (W.D. Wis. 2003) (district court cannot consider new evidence on appeal that was never presented to bankruptcy court).  And, of course, district courts cannot make independent findings of fact on appeal.  *See JP Morgan Chase Bank v. ELL 11, LLC*, 414 B.R. 881 (M.D. Ga. 2008) (in bankruptcy appeal context, "district court is not authorized to make independent findings of fact").

[21]    The Court is cognizant that the Lisa May Affidavit was filed in the bankruptcy proceedings during summary judgment briefing.  The Court is also aware of Judge Shulman's admonition to the parties at the outset of trial "to stick to the issues that are in dispute and not dwell … [on] matters … already in evidence.  We don't need to dwell on that, we just need to get to the points that are in dispute and thus shorten what it is that you want to present to the Court." (Trial Transcript, at 4-5.)  But May's accusation that an IRS revenue officer sexually harassed his wife and punished him for his wife's resistance is unquestionably "in dispute," as the Government categorically denied it.  Given these circumstances, it would have been unreasonable for May to assume at trial that he could forego proof of accusations of scandalous behavior by an IRS agent, and instead rely on a cold affidavit from summary judgment (which he never offered into evidence or otherwise referenced at trial anyway) to prove up his harassment accusations against the IRS agent.  Had May wished to pursue this line of argument, it was May's responsibility to develop supporting evidence at trial, and to alert the Bankruptcy Court that he believed this factor warranted consideration in the § 523(a)(1)(C) analysis.  His failure to (Continued)

Next, May repeatedly suggests that the Bankruptcy Court erred by not giving due credit to his status as a mere innocent victim swept up in circumstances beyond his control. For example, May maintains that he did not mismanage his financial affairs, but was instead "the victim of a cheating contractor." (Appellant's Brief, at 19.) He says that he found himself in an "intractable dilemma" and did the best he could. (*Id.* at 20.)[22] This assignment of error is groundless because, yet again, the Bankruptcy Court specifically considered these facts. Indeed, while explicitly noting May's "difficult financial choices" arising from "cost overrun for the renovations of the Magnolia Springs property" (doc. 65, at 15), the Bankruptcy Court found from the totality of the circumstances that the "mental state" requirement for nondischargeability was satisfied based on other facts in the record (*i.e.*, his structuring of his affairs to avoid holding any real or personal property in his own name, his failure properly to list assets in his bankruptcy schedules, his purposeful diversion of assets and earnings to others rather than paying his taxes, etc.). The Bankruptcy Court's weighing and balancing of the facts in this manner was not error, much less clear error.[23]

---

do so then precludes him from doing so now on appeal. Even if this argument were proper, and even if the Bankruptcy Court's failure to make a finding of sexual misconduct by the IRS agent toward Mrs. May amounted to clear error, the outcome of the § 523(a)(1)(C) analysis would remain unchanged. Simply put, the finding that May willfully evaded his income tax obligations would stand regardless of whether the IRS revenue officer behaved appropriately toward May's wife or not. The IRS officer's interactions with Mrs. May are, at most, a collateral matter having minimal bearing on the "conduct" and "mental state" analysis under § 523(a)(1)(C).

[22]     This argument typifies May's recurring refrain of deflecting blame away from himself for his failure to pay known tax obligations. At various times, May argues that his situation is the fault of an unscrupulous contractor, predatory and/or vindictive IRS revenue officers, the economic downturn, and so on. Notwithstanding this laundry list of excuses, it was not clearly erroneous for the Bankruptcy Court to conclude that May's own intentional, knowing and evasive conduct placed him in the tax predicament in which he now finds himself.

[23]     In this same vein, May contends that the Bankruptcy Court's rulings should be reversed because "there is no evidence in this record of fraud, deceit, dishonesty, evil intent of [sic] bad purpose." (Appellant's Brief, at 20.) But § 523(a)(1)(C) does not require proof of evil intent or fraudulent behavior. *See, e.g., Jacobs*, 490 F.3d at 925 (reaffirming that "fraudulent intent is not required for § 523(a)(1)(C)'s mental state prong") (citation and internal quotation marks omitted); *In re Ryals*, 424 B.R. 539, 544 (Bankr. M.D. Fla. 2009) ("[I]n order to show that a debtor voluntarily and intentionally violated his duty to pay, it is not necessary to establish fraudulent intent."); *Carroll v. United States*, 415 B.R. 561, 567 (N.D. Ala. 2009) (mental state (Continued)

Finally, in his Reply Brief, May nitpicks a number of the Bankruptcy Court's findings of fact. In particular, he asserts that his bankruptcy statement of financial affairs was not inaccurate because he does not really own any interest in the marital property, that the Bankruptcy Court "may assume" that May paid as much money toward his IRS debts as he could, that Mrs. May attempted another refinancing of the Magnolia Springs house after this Court ruled that May had a beneficial interest in the property and that Mrs. May was his nominee, that his various trips and other expenses were not extravagant, that keeping his money in corporate bank accounts was not evasive, and that many of the facts held against him amount to mere "common business practices." (Reply Brief, at 5-9, 11-12.) These contentions, individually and collectively, are unpersuasive for the following reasons: (i) several of them are effectively brand-new arguments not presented in May's principal brief, and are therefore not properly before this Court; and (ii) May cites little to no record evidence for most of those arguments, but instead attempts to inject new facts into the record based on his own unadorned say-so in his briefs.

Even if these arguments were properly presented and supported by record evidence, this Court is of the opinion that the Bankruptcy Court's resolution of each of those factual issues should not be disturbed. On this record and on these briefs, the Bankruptcy Court did not clearly err in finding that May paid $180,000 for renovations of property in his wife's name while owing the 1998-99 taxes; that he had placed title to the cars he drove in others' names; that he avoided having a personal checking account but diverted his earnings into business accounts from which his wife paid personal obligations; that he stated the value of the corporation in bankruptcy schedules as $1,000 even as he listed a $63,367 receivable in the corporation's 2008 tax return; that he failed accurately to list his interest in the Magnolia Springs property or his automobiles in 2002 and 2008 bankruptcy schedules; and that his discretionary spending (including paying for a European trip for family members, traveling to a Florida resort and a luxury hotel in New Orleans, etc.) drained substantial debtor funds that could have been used to pay known delinquent tax obligations. (Doc. 65, at 11-12.) Debtor may disagree with those findings of fact,

requirement satisfied where debtor's conduct stretched beyond non-payment of tax debt, including deliberate depletion of assets with conscious and willful disregard for existing tax burden). As such, the absence of fraudulent intent is not a basis for finding that the Bankruptcy Court erred in deeming the "mental state" requirement satisfied.

but there was record support for all of them.  Nor was it erroneous for the Bankruptcy Court to conclude from these facts that "the Debtor took affirmative acts to evade or defeat a tax under § 523(a)(1)(C)" and that "he acted knowingly and consciously" in undertaking to evade his tax liabilities.  (*Id.* at 12, 15.)

    **2.**  ***Whether This Case is More Like* Jacobs *or* Haas.**

    Closely related to the above discussion is May's argument on appeal that the Bankruptcy Court erred in likening this case to *In re Jacobs*, 490 F.3d 913 (11th Cir. 2007) rather than *In re Haas*, 48 F.3d 1153 (11th Cir. 1994).

    In *Haas*, the debtor chose not to pay his taxes and instead devoted his financial resources to other purposes, in spite of both awareness of his duty and the ability to pay.  The *Haas* bankruptcy court expressly found that the debtor, "other than his failure to pay the obligation, made no attempt to defeat or evade his obligation." *Id.* at 1154 n.2.  Upon close scrutiny of § 523(a)(1)(C), the Eleventh Circuit held that "a debtor's failure to pay his taxes, alone, does not fall within the scope of section 523(a)(1)(C)'s exception to discharge in bankruptcy." *Id.* at 1158.  May contends that his case is "very similar to the facts in *Haas*" because May "simply chose to use money reserved for the payment of taxes to complete an ill fated renovation project." (Appellant's Brief, at 18.)  This Court concurs with the Bankruptcy Court's assessment that May's circumstances have little in common with those in *Haas*.  Unlike the debtor in *Haas*, May transferred substantial assets to family members both before and after the subject tax liabilities became due.  Unlike the debtor in *Haas*, May titled his vehicles in others' names and deposited his earnings in corporate bank accounts from which his wife paid personal expenses (including substantial outlays for maintenance, mortgage, and modification of the Magnolia Springs house that May had titled in his wife's name).  Unlike the debtor in *Haas*, May concealed his beneficial interest in the Magnolia Springs property in his 2008 bankruptcy schedules despite a final federal adjudication (appealed all the way to the U.S. Supreme Court) that he in fact holds such an interest.  Unlike the debtor in *Haas*, May listed the value of his business in his bankruptcy schedules vastly differently than on the business's tax documents, and at trial chalked up the difference to what he called "an accounting trick." (Trial Transcript, at 70.)  Given these circumstances and factual findings, it was not error for the Bankruptcy Court to reject May's attempts to align his case with *Haas*.

Similarly, while appellant takes the Bankruptcy Court to task for equating May's circumstances to those in *Jacobs*, the ruling on this point was justified. In *Jacobs*, the appeals court found that the Bankruptcy Court had clearly erred in concluding that the debtor did not willfully attempt to evade or defeat taxes based on facts that the debtor titled the marital property solely in his wife's name, made all mortgage payments on the property himself, failed to pay estimated taxes on earnings through his law firms, titled his vehicles in other people's names, arranged for those vehicles to be purchased using money from law firm accounts, and made large discretionary expenditures. 490 F.3d at 927. The Bankruptcy Court found that these factors were present in May's case as well, and remarked that May's "actions have a striking similarity to those of the debtor in" *Jacobs*. (Doc. 65, at 11.) The parallels from May's conduct to the debtor in *Jacobs*' conduct are substantial and undeniable, so appellant's reproach of the Bankruptcy Court for drawing such an analogy is unwarranted. In both *Jacobs* and this case, the debtor titled marital property and vehicles in others' names, paid expenses for property that nominally did not belong to him, used business accounts for personal spending, and made substantial discretionary expenditures during the time when he owed the taxes. If anything, May's conduct was more egregious than that in *Jacobs* given May's misrepresentations of assets on bankruptcy schedules. And the Bankruptcy Court quite properly noted that "[t]he difference between the expenditures in *Jacobs* and the present case is only a matter of scale," with both debtors engaged in discretionary spending that "took away substantial funds that could have been used to pay delinquent taxes." (Doc. 65, at 12.) It was certainly not error for the Bankruptcy Court to rely on *Jacobs* by analogy in its § 523(a)(1)(C) analysis. May's argument to the contrary is without merit.[24]

---

[24] May would distinguish *Jacobs* for two reasons. First, he asserts that in *Jacobs* "the transfers occurred in the midst of the taxes at issue being due." (Appellant's Brief, at 15.) But the same is true here, given the Bankruptcy Court's findings about May deploying $180,000 of his earnings to renovations of property titled in someone else's name in the midst of the taxes at issue being due. That expenditure was itself an evasive transfer of assets from May to Mrs. May. Second, May points out that the *Jacobs* debtor spent far more money on lavish discretionary expenditures than May did. Appellant's observation is correct, but the Bankruptcy Court was likewise correct in characterizing this distinction as being one of scale rather than of kind. And May's attempt to cast the Bankruptcy Court's ruling as somehow in conflict with its comments during the trial about *Jacobs* being distinguishable is not persuasive. The undersigned (Continued)

Even setting aside *Haas* and *Jacobs* for a moment, the Bankruptcy Court's ruling is well grounded in the developed case law applying § 523(a)(1)(C).[25] Courts stress the wide variety of circumstances in which a willful evasion of tax obligations can be found, and resist attempts to pigeonhole that statute to apply only in particular narrow, discrete circumstances.[26] Courts find the transfer of assets to be indicative of willful evasion of tax liabilities.[27] They regard the use of

---

perceives no inconsistency between the judicial statements made during the trial and the reasoning of the March 17 Order; rather, the two may be readily harmonized.

[25]    For example, an alternative to the *Jacobs* analogy could be found by comparing May's circumstances to those in *In re Zimmerman*, 2008 WL 161423, *2 (11th Cir. Jan. 18, 2008). In *Zimmerman*, the Eleventh Circuit deemed the conduct requirement satisfied where the debtor had embarked on a pattern of "failure to pay taxes knowing they were owed while supporting a lifestyle of oceanfront living and luxury cars, together with very substantial intra-family transfers and transfers to [debtor's girlfriend] for no consideration." *Id.* at *2. Likewise, the willfulness requirement was met where the debtor, a trained CPA, "knew taxes were owing," but instead of paying them "engaged in abusive bankruptcy filings, transferred assets without consideration to defeat tax collection, and enjoyed a lavish lifestyle." *Id.* at *3. These same kinds of circumstances are present, albeit on a different scale, for May.

[26]    *See Ryals*, 424 B.R. at 544 ("[T]he government can satisfy the conduct requirement by showing that a debtor engaged either in acts of commission or culpable acts of omission to avoid payment or collection of taxes. … There are myriad fact patterns in which courts have concluded that acts or omissions, coupled with the failure to pay taxes, satisfy the conduct requirement of § 523(a)(1)(C)."); *Carroll*, 415 B.R. at 566 ("For example, a debtor has committed an 'affirmative act' if, instead of paying an outstanding tax debt to the United States, he engages in intra-family transfers of property with little or no consideration …, makes loans to family members for no consideration, or spends personal funds on luxury items."); *In re Harris*, 328 B.R. 837, 843-44 (Bankr. S.D. Ala. May 5, 2005) ("Courts recognize numerous indicia of fraud including understatement of income; implausible or inconsistent explanations of behavior; inadequate records; concealment of assets; failure to cooperate; transfer of assets to a family member; transfers for inadequate consideration; transfers that greatly reduced assets subject to IRS execution; lavish lifestyle; and transfers made in the face of serious financial difficulties. … [T]he presence of multiple factors gives rise to a rebuttable presumption of willful evasion.") (citations omitted); *Sly v. United States*, 318 B.R. 194, 200 (N.D. Fla. 2004) ("the badges of fraud are to be considered in their entirety and the determination of whether the debtor fraudulently filed taxes should be based on the totality of the circumstances").

[27]    *See United States v. Doyle*, 276 F. Supp.2d 415, 427-28 (W.D. Pa. 2003) ("An attempt to conceal, transfer, or otherwise assign assets in an effort to put them beyond the reach of the IRS for tax collection purposes is a manner of attempting to evade or defeat such tax, within the plain meaning of section 523(a)(1)(C).") (citations and internal quotation marks (Continued)

business accounts for personal assets as another symptom of willful evasion. *See In re Hamm*, 356 B.R. 263, 281 (Bankr.S.D. Fla. 2006) (noting that by using a business account to pay personal expenses, the debtors "managed to protect personal assets in a place safe from levy by the Internal Revenue Service ... the Debtors used the business account ... as a kind of personal piggy bank upon which the Internal Revenue Service could not easily levy"). They consider the debtor's bankruptcy history as pertinent to the willful evasion inquiry. *See Hassan*, 381 B.R. at 300 (nondischargeability finding particularly warranted "where debtors find themselves in their second bankruptcy after continuing to accrue, and attempting to avoid, further tax liabilities in the interim"). And they are not unduly concerned with the nomenclature of whether expenditures qualify as "lavish," so long as the debtor engaged in substantial discretionary spending rather than paying down his taxes.[28] Thus, the Bankruptcy Court's rulings in this case properly applied and interpreted § 523(a)(1)(C) in a manner fully consistent with existing precedents.

### C.  *Debtor's Ability to Pay when Taxes Became Due.*

Appellant's final assignment of error is that the Bankruptcy Court should not have deemed May's tax liabilities nondischargeable without proof of present ability to pay. In May's words, "the government must produce evidence that the debtor had the present ability to pay the taxes when they became due. There is no evidence of present ability to pay in the record." (Appellant's Brief, at 5.) This objection need not long detain the Court.

---

omitted); *Hassan*, 301 B.R. at 622 (finding of nondischargeability was warranted where debtor made loans to daughter and made payments on property in daughter's name, constituting intra-family transfers of funds without consideration); *Volpe*, 377 B.R. at 588 (debtor's act of putting title to his residence in his mother's name prevented IRS from placing tax levy on the property and was "affirmative act of evasion"); *Sly*, 318 B.R. at 202-03 (conduct requirement satisfied where debtor transferred business for one dollar to avoid paying taxes on profits).

[28]     *See In re Bryen*, 433 B.R. 503, 518 (Bankr. E.D. Pa. 2010) ("Regardless whether the label 'lavish' is employed here, I am convinced that the debtor had ample income from which he could have made at least some payment on the Tax Debt."); *Volpe*, 377 B.R. at 590 (no dischargeability where "a business savvy debtor who knew that he had an obligation to pay taxes, chose instead to ignore this duty and spend his money elsewhere, concealing a valuable real estate asset in the process"); *Harris*, 328 B.R. at 845 (conduct requirement satisfied where debtor "embarked on a lifestyle of spending while totally ignoring his obligation to timely file returns and pay taxes").

As an initial matter, May identifies no authority for the proposition that the Government must prove ability to pay at the time taxes become due as a mandatory prerequisite for nondischargeability under § 523(a)(1)(C). There is substantial authority to the contrary. For example, the Fifth Circuit analyzed two of the three cases cited by May on page 23 of his principal brief and concluded that "the key § 523(a)(1)(C) determination is whether debtor's conduct is *willful*. Whether debtor has the ability to pay is, of course, an appropriate factor in making that determination, ***but it is* not *a litmus test.*" *In re Grothues*, 226 F.3d 334, 339 (5th Cir. 2000) (emphasis added); *see also Hamm*, 356 B.R. at 283 n.15 (observing that "[a]bility to pay in full is not a requirement" of § 523(a)(1)(C), and that a debtor can willfully evade taxes even if he lacks financial means to pay all taxes owed); *United States v. Doyle*, 276 F. Supp.2d 415, 424 (W.D. Pa. 2003) (studying *Fegeley* decision on which May relies and concluding that debtor's financial ability to have paid taxes is but one factor in totality of the evidence analysis). Certainly, nothing in the text of the statute or the Eleventh Circuit's holdings supports a rule that proof of ability to pay in full when the taxes became due is necessary for tax liabilities to be nondischargeable under § 523(a)(1)(C). To the contrary, the Eleventh Circuit has intimated that imposing such a requirement would be unhelpful, inasmuch as "*every* debtor, at least in theory, has the present ability to pay his income or employment taxes; if a debtor did not have positive net income, then he would not have been assessed income or employment taxes in the first instance." *Haas*, 48 F.3d at 1155. In light of the foregoing decisions, and appellant's failure to identify countervailing authority, the Court cannot agree with May's legal premise that the Bankruptcy Court's rulings must be reversed in the absence of proof of his ability to pay when the taxes became due.[29]

---

[29] To the extent that May might reframe his argument as relating to his financial ability to pay today, rather than when the taxes became due, that contention would also fail as a matter of law. Whether May is capable of paying the tax liabilities in full today is of little import to the analysis. *See Birkenstock*, 87 F.3d at 953 ("[J]ust as nonpayment of tax alone will not justify nondischargeability, an inability to pay debts in subsequent years is not a defense to previous intentional attempts to evade or conceal one's tax liabilities. To hold otherwise would swallow the § 523(a)(1)(C) exception to discharge because even the most dishonest bankrupt can demonstrate an inability to pay his debts."); *Carroll*, 415 B.R. at 567 n.24 (rejecting debtor's argument about present inability to pay as "not relevant to the legal issue before this court" and "disingenuous" based on debtor's conscious decision "to let the tax debt fall by the wayside," such that his "inability to pay the tax debt is a creature of his own making").

Even if May were correct that a nondischargeability finding cannot stand without proof that the debtor was able to pay the tax liability when it arose, the record before the Bankruptcy Court unquestionably contained such evidence. In his own trial testimony, May acknowledged that, as of the end of 1998 and beginning of 1999, he possessed sufficient funds to satisfy his outstanding tax liability for that tax year. (Trial Transcript (doc. 93), at 25, 58.) In light of this testimony, appellant's contention in his principal brief that he "did not have the ability to pay the taxes when they became due" (Appellant's Brief, at 23) appears not only untethered to, but affirmatively contradicted by, the record on appeal. Moreover, in reply to the Government's argument on this point in its opposition brief, May chose to be silent, offering neither argument nor evidence in his reply brief to rebut the Government's position and advance his assignment of error concerning ability to pay.

Because this ground for appeal suffers from both legal and factual infirmities that May has not adequately addressed, the Court finds no error in the Bankruptcy Court's failure (i) to impose an ability-to-pay litmus test under § 523(a)(1)(C), and (ii) to make a factual finding that May was unable to pay those tax liabilities when they became due.

**V.    Conclusion.**

Statutory exceptions to discharge in bankruptcy are generally construed "liberally in favor of the debtor in order to ensure that the honest but unfortunate debtor is afforded a fresh start." *Griffith*, 206 F.3d at 1394 (citations and internal quotation marks omitted). After a trial on the merits, however, the Bankruptcy Court found that May was not an honest but unfortunate debtor of the kind the Bankruptcy Code was designed to protect, but that he had acted willfully to evade or defeat payment of his federal income taxes for 1998 and 1999, rendering those liabilities nondischargeable under § 523(a)(1)(C). Upon careful review of May's numerous asserted grounds for appeal, this Court finds no clear error in the Bankruptcy Court's findings of fact and no error in its conclusions of law. Accordingly, the orders of the Bankruptcy Court deeming May's 1998 and 1999 federal income tax liabilities nondischargeable are due to be, and the same hereby are, **AFFIRMED**.

DONE and ORDERED this 30th day of November, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE